**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| MARTHA GONZALEZ, individually and on behalf of all others similarly situated, | § § § | |
| Plaintiffs, | § § | CAUSE NO. 1:18-cv-00169-LY |
| v. | § § | |
| CORECIVIC, INC., | § § | |
| Defendant. | § § | |

<u>**DEFENDANT CORECIVIC'S MOTION TO DISMISS**</u>

Pursuant to Fed. R. Civ. P. 12(b), Defendant CoreCivic moves this Court to dismiss Plaintiff's Complaint because it fails to state a claim.

**I.     BACKGROUND**

**A.     Factual Allegations**

Plaintiff Martha Gonzalez, a Mexican national, alleges that she illegally entered the United States in May 2016, and voluntarily turned herself in to immigration officials. (Dkt. 1, ¶¶ 4.32-4.40.) She further alleges that she was taken into custody by the Bureau of Immigration and Customs Enforcement ("ICE"), and detained at the Laredo Detention Center, in Laredo, Texas, and the T. Don Hutto Residential Center, in Taylor, Texas, pending her deportation proceedings. (Id., ¶¶ 2.1, 4.23-4.25, 4.37-4.40, 4.46-4.49.) These detention centers "are owned and operated by CoreCivic" "for the benefit of the United States of America and [ICE]," and detain "immigrants in the country illegally, asylum seekers, green card holders, and those awaiting immigration hearings." (Id., ¶¶ 4.11, 4.25, 4.45.)

Gonzalez alleges that, while detained at these facilities, she was paid only $1 or $1.50 per day to clean pods, work in the kitchen, sort laundry, and perform other duties, and did so "under

threat of punishment, including but not limited to lockdown and/or solitary confinement."
(Dkt. 1, ¶¶ 4.5, 4.31, 4.52-4.53, 4.56, 4.66.)  She alleges that other detainees were forced to work
and not paid at all.[1]  (Id., ¶¶ 4.3, 4.54, 4.66.)  According to Gonzalez, if detainees refused to
work, CoreCivic threatened them "with confinement, physical restraint, substantial and sustained
restrictions, deprivation, violation of their liberty, and solitary confinement."  (Id., ¶¶ 4.8, 4.52,
4.59.)  This included the denial or delay of hygiene products, for example, a toothbrush,
toothpaste, or feminine products.  (Id., ¶¶ 4.59-4.60.)  Those who did work were provided items
"without any delay or hassle."  (Id., ¶ 4.63.)

### B.    Claims

Gonzalez filed her Complaint on behalf of herself and "all other persons similarly
situated."  (Dkt. 1, ¶ 1.)  The putative class is defined as:

> All civil immigration detainees who performed labor for no pay or
> at a rate of compensation of $1.00 to $2.00 per day for work
> performed for CoreCivic at any detention facility owned or
> operated by it from February 20, 2007 to the applicable opt-out
> date, inclusive.

(Id., ¶ 5.1.)  She raises three claims: (1) a violation of the Trafficking Victims Protection Act,
18 U.S.C. § 1589; (2) negligence; and (3) unjust enrichment.  (Id., ¶¶ 6.1-8.9.)  She requests

---

[1] Specifically, Gonzalez alleges she and other detainees were forced to: (a) scrub
bathrooms, showers, and toilets; (b) clean and maintain CoreCivic's on-site medical facility;
(c) clean floors and windows; (d) clean patient rooms and medical staff offices; (e) sweep, mop,
strip, and wax floors throughout the medical facility and the entire facility; (f) launder medical
facility laundry; (g) launder detainee laundry; (h) prepare and serve detainee meals; (i) assist in
preparing catered meals for law enforcement events sponsored by CoreCivic; (j) perform clerical
work for CoreCivic; (k) sort and prepare clothing for newly arriving detainees; (l) provide barber
services to detainees; (m) run and manage the law library; (n) clean intake areas and the solitary
confinement unit; (o) clean and prepare vacant portions of the facility for newly arriving
detainees; (p) clean the facility's warehouse; and (q) maintain the exterior and landscaping of the
CoreCivic buildings.  (Dkt. 1, ¶¶ 4.5-4.7.)

declarative and injunctive relief, as well as restitution, compensatory, treble, and punitive damages, and disgorgement of profits.  (Id. at 35-36.)

## II.   STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (1986)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'"  *Id*. at 678 (quoting *Twombly*, 550 U.S. at 555, 557) (internal citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*. at 678.

A complaint must allege sufficient factual matter that is "plausible on its face."  *Iqbal*, 556 U.S. at 678.  Plausibility requires more than a "sheer possibility that a defendant has acted unlawfully."  *Id*.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief." *Id*. (internal quotation marks omitted).  Although in ruling on a Rule 12(b) motion to dismiss the Court must accept factual allegations in the complaint as true, it is not required to "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions."  *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005).  A complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

**III.     THE COURT SHOULD DISMISS PLAINTIFF'S TVPA CLAIM.**

**A.     The Trafficking Victims Protection Act**

In 2000, Congress enacted the Trafficking Victims Protection Act ("TVPA").  Pub. L. No. 106-386, § 102(a), 114 Stat. 1488 (2000).  Congress explicitly declared that the purpose of the TVPA was "to combat *trafficking in persons*, a contemporary manifestation of *slavery* whose victims are predominantly women and children, to ensure just and effective punishment of *traffickers*, and to protect their victims."  Pub. L. No. 106-386, § 102(a), 114 Stat. 1488 (2000) (emphasis added); *accord Johns v. Daniel*, No. CIV.A. H-13-2666, 2014 WL 1882760, at *3 (S.D. Tex. May 12, 2014) ("The TVPA was enacted as 'an Act to combat trafficking of persons, especially into the sex trade, slavery, and slavery-like conditions, in the United States and countries around the world through prevention, through prosecution and enforcement against traffickers, and through protection and assistance to victims of trafficking.'") (quoting H.R. Conf. Rep. 106–939, at 1 (2000)).

That stated purpose was supported by twenty four (24) congressional findings, all of which focused on the evils of "trafficking of persons" and "slavery" and punishing those who participate in the "trafficking scheme."  Pub. L. No. 106-386, § 102(b), 114 Stat. 1488 (2000). For example:

> (b)(1) As the 21st century begins, the degrading institution of *slavery* continues throughout the world. *Trafficking in persons* is a modern form of *slavery*, and it is the largest manifestation of *slavery* today. At least 700,000 persons annually, primarily women and children, are *trafficked within* or across international borders. Approximately 50,000 women and children are *trafficked into* the United States each year.
>
>        *     *     *
>
> (b)(5) *Traffickers* often transport victims from their home communities to unfamiliar destinations, including foreign countries away from family and friends, religious institutions, and other

sources of protection and support, leaving the victims defenseless and vulnerable.

\*       \*       \*

(b)(8) *Trafficking in persons* is increasingly perpetrated by organized, sophisticated criminal enterprises. Such *trafficking* is the fastest growing source of profits for organized criminal enterprises worldwide. Profits from the *trafficking industry* contribute to the expansion of organized crime in the United States and worldwide.

\*       \*       \*

(b)(12) *Trafficking in persons* substantially affects interstate and foreign commerce. *Trafficking* for such purposes as involuntary servitude, peonage, and other forms of forced labor has an impact on the nationwide employment network and labor market.

\*       \*       \*

(b)(14) Existing legislation and law enforcement in the United States and other countries are inadequate to *deter trafficking* and bring *traffickers* to justice, failing to reflect the gravity of the offenses involved. No comprehensive law exists in the United States that penalizes the range of offenses involved in the *trafficking scheme*. …

\*       \*       \*

(b)(24)   *Trafficking in persons* is a transnational crime with national implications. To *deter international trafficking* and bring its perpetrators to justice, nations including the United States must recognize that *trafficking* is a serious offense. This is done by prescribing appropriate punishment, giving priority to the prosecution of *trafficking offenses*, and protecting rather than punishing the victims of such offenses.

*Id*. (emphasis added). The TVPA's purpose and findings are codified at 22 U.S.C.

§ 7101.

- 5 -

In furtherance of these objectives, and as part of the TVPA, Congress enacted several corresponding criminal statutes, *see* 18 U.S.C. §§ 1581-1594, including 18 U.S.C. § 1589(a), which makes it a crime to:

> knowingly provide[] or obtain[] the labor or services of a person by any one of, or by any combination of, the following means--
>
> > (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> >
> > (2) by means of serious harm or threats of serious harm to that person or another person;
> >
> > (3) by means of the abuse or threatened abuse of law or legal process; or
> >
> > (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

In 2003, Congress enacted the Trafficking Victims Protection Reauthorization Act ("TVPRA").   Pub. L. No. 108-193, 117 Stat. 2875 (2003).  Congress determined that "[*t*]*rafficking in persons* continues to victimize countless men, women, and children in the United States and abroad."  Pub. L. No. 108-193, § 2, 117 Stat. 2875 (2003).  It also found that, since the enactment of the TVPA, "the United States Government has made significant progress in investigating and prosecuting acts of *trafficking* and in responding to the needs of *victims of trafficking* in the United States and abroad," but that there were still obstacles hindering its efforts "to investigate, prosecute, and convict *traffickers*."  *Id*. (emphasis added).  As part of the TVPRA, and to "enhanc[e] protection for *trafficking* victims," Congress enacted 18 U.S.C. § 1595, which authorized a civil action for any "individual who is a victim of a violation of section 1589 … against the perpetrator ...."  Pub. L. No. 108-193, § 4, 117 Stat. 2875 (2003)

(emphasis added). Congress amended § 1595 in 2008 to allow a civil action against "whoever knowingly benefits, financially or by receiving anything of value from participation *in a venture* which that person knew or should have known has engaged in an act in violation of" § 1589. Pub. L. No. 110-457, § 221, 122 Stat. 5044 (2008) (emphasis added).

**B.    The TVPA Does Not Extend to Labor Performed by Immigration Detainees in Lawful Custody of the United States Government.**

Given the TVPA's express purpose to eradicate modern-day slavery and target, prosecute, and deter human traffickers—those who transport persons "across international borders" or take them "from their home communities to unfamiliar destinations" and force them to work—Congress could not have intended the TVPA to apply in the context of labor performed by immigration detainees in lawful custody of the federal agency obligated to detain them.

Where the literal application of a criminal statute "would lead to extreme or absurd results, and where the legislative purpose gathered from the whole act would be satisfied by a more limited interpretation," the "[g]eneral terms descriptive of a class of persons made subject to a criminal statute may and should be limited." *United States v. Katz*, 271 U.S. 354, 362 (1926); *see also Dolan v. U.S. Postal Service*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."); *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("[S]tatutory language cannot be construed in a vacuum."); *United States v. Rodriguez-Rios*, 14 F.3d 1040, 1044 (5th Cir. 1994) ("We are authorized to deviate from the literal language of a statute only if the plain language would lead to absurd results, or if such an interpretation would defeat the intent of Congress.").

Thus, for example, in *United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014), the Sixth Circuit held that the TVPA did not apply in the case of a man who forced children in his care to

do household chores.  The criminal defendant made the children clean (including washing the floors, windows, bathrooms, and dishes), do laundry, prepare food, serve food to his guests, iron his clothes, clean his car, and babysit for the women he was dating or for his relatives.  *Id*. at 624-25.  He would beat the children if they misbehaved or failed to follow his rules.  *Id*.  The court held that this did *not* constitute "labor" under the TVPA even though it was "labor" in the "economic sense of the word."  *Id*. at 625.  None of the "labor" performed went beyond what a parent or guardian would "expect from his child," and the fact that the man required the children to perform those chores by means of child abuse did "not change the nature of the work."  *Id*.  In other words, "the extremity of force is … not a determinant of forced labor, one way or the other."  *Id*. at 626.

Even though the man's conduct was reprehensible, the Sixth Circuit refused to "transform a statute passed to implement the Thirteenth Amendment against slavery or involuntary servitude into one that generally makes it a crime for a person *in loco parentis* to require household chores, or makes child abuse a federal crime."  *Id*. at 629.  It explained that absent a clear expression of Congressional intent, the statute should not be literally interpreted to criminalize activity traditionally regulated by the states.  *Id*. at 628 (citing *Bond v. United States*, 134 S.Ct. 2077, 2088 (2014) (declining to extend chemical weapons statute enacted to combat assassination, terrorism, and acts of mass suffering to criminalize jilted wife's garden-variety assault on her husband's paramour)).

Applying the TVPA in the context of this case would similarly go far beyond Congress's stated (and codified) intent.  The purpose of the TVPA is to deter human trafficking, punish human traffickers, and protect victims of human trafficking of slavery.  22 U.S.C. § 7101.  Neither ICE nor CoreCivic is engaged in a "trafficking scheme" or "criminal enterprise[]" to

enslave immigrants.  ICE "is the federal agency 'responsible for the apprehension and detention of inadmissible and deportable aliens." *Doe v. Neveleff*, A-11-CV-907-LY, 2013 WL 489442, at *1 (W.D. Tex. Feb. 8, 2013), *report and recommendation adopted*, A-11-CV-907-LY, 2013 WL 12098684 (W.D. Tex. Mar. 12, 2013) ("*Doe I*") (quoting *Safety Nat'l Cas. Corp. v. U.S. Dep't of Homeland Sec.*, 711 F. Supp. 2d 697, 703 (S.D. Tex. 2008)).   Its authority derives from Congress.  *See* 8 U.S.C. § 1103(a); 8 C.F.R. Part 236.[2]

Here, ICE was engaged in that statutorily mandated duty.  It did not remove Gonzalez from her home and bring her to Texas.  *Cf. Toviave*, 761 F.3d at 629-30 (recognizing that cases in which forced labor has been found in the household context involved individuals who "were brought to the United States to work and who were subsequently cheated out of the salaries they were promised all while being subjected to intolerable living conditions," "subjected … to more extreme isolation," and "denied almost all contact with the outside world").  Moreover, as Gonzalez alleges, ICE contracts with privately owned and operated facilities, like Laredo and Hutto, to house civil immigration detainees in its (ICE's) custody on its behalf.  (Dkt. 1, ¶¶ 4.23-4.26, 4.45.)   In housing immigration detainees (and Gonzalez), CoreCivic was "performing a federal function."[3]  *Doe v. United States*, 831 F.3d 309, 316-17 (5th Cir. 2016) ("*Doe II*"); *see*

---

[2] Immigration enforcement functions were previously held by the Immigration and Naturalization Service ("INS"), an agency of the Department of Justice, but on March 1, 2003, the INS ceased to exist, and its enforcement functions were transferred to the newly-created Department of Homeland Security, and, specifically, ICE. *See Silva Rosa v. Gonzales*, 490 F.3d 403, 404 n.1 (5th Cir. 2007); *Mortera-Cruz v. Gonzales*, 409 F.3d 246, 248 n.1 (5th Cir. 2005); *see generally* Pub. L. No. 107-296, §§ 441, 451, 471, 116 Stat. 2135 (2002).

[3] Even before the TVPA, the INS and ICE have always required their detention facilities, including Laredo and Hutto, to have a Voluntary Work Program ("VWP").  *See* INS National Detention Standards – Voluntary Work Program (Sept. 28, 2000), https://www.ice.gov/doclib/dro/detention-standards/pdf/work.pdf, and ICE Performance-Based National Detention Standards 2011, § 5.8, at 406 (2016 ed.), https://www.ice.gov/doclib/detention-standards/2011/5-8.pdf. The purpose of the VWP is to

*also Doe I*, 2013 WL 489442, at \*13 ("There is no dispute that CCA carried out purely federal functions at the Hutto facility.").  Like *Toviave*, nothing in the TVPA demonstrates a clear expression of intent by Congress to impinge upon ICE's authority to detain immigration detainees and transform into a federal crime the work performed by federal detainees pursuant to the terms of their detention.  *See Toviave*, 761 F.3d at 628.

Indeed, the labor and services alleged by Gonzalez—e.g., cleaning the facility, laundry, preparing and serving food, etc.—are the type that courts have found are expected to be performed by detainees in custody.  *See id.*, 761 F.3d at 625.  For example, in *Channer v. Hall*, 112 F.3d 214, 215 (5th Cir. 1997), an immigration detainee alleged federal officials "compel[ed] him to work in the Food Services Department while he was an INS detainee," in violation of the Thirteenth Amendment (involuntary servitude). The detainee alleged he was "intimidated and threatened with solitary confinement if he failed to work."  *Id*. at 218.  The Fifth Circuit held that the detainee was not subjected to involuntary servitude because "the federal government is

---

reduce the negative impact of confinement through "decreased idleness, improved morale and fewer disciplinary incidents." (Id. at 405.) Detainees who participate in the VWP must "sign a voluntary work program agreement" and are paid "at least $1.00 (USD) per day." (Id. at 407-408.)  Detainees may also volunteer for "temporary work details," which "may involve labor-intensive work." (Id.)  But once they have volunteered to work, they are required "to be ready to report for work at the required time and may not leave an assignment without permission."  (Id.) The detainee is also required to "perform all assigned tasks diligently and conscientiously" and "may not evade attendance and performance standards in assigned activities nor encourage others to do so."  (Id. at 408.)  A detainee can be removed from the VWP for "[u]nexcused absences," "unsatisfactory work performance," "disruptive behavior," "threats to security," "physical inability to perform the essential elements of the job," or "a removal sanction imposed by the Institution Disciplinary Panel for an infraction of a facility rule, regulation or policy." (Id. at 407-408.) Though detainee participation in the VWP is purely voluntary and a detainee can stop participating at any time, ICE *requires* detainees "to do personal housekeeping." (Id. at 405-06.)  CoreCivic is required to enforce these ICE standards. (Id. at 406.) This Court may take judicial notice of these standards, *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005), and can do so without converting this Motion into a motion for summary judgment, *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).

entitled to require a communal contribution by an INS detainee in the form of housekeeping tasks." *Id*. at 218-19 (citing *United States v. Kozminski*, 487 U.S. 931, 943 (1988)).  The court relied on other cases that exempted housekeeping chores by civil detainees, such as "fixing meals, scrubbing dishes, doing the laundry, and cleaning the building."  *Id*. at 219 (citing *Bayh v. Sonnenburg*, 573 N.E.2d 398 (Ind. 1991); *Jobson v. Henne*, 355 F.2d 129 (2d Cir. 1966)); *see also Owuor v. Courville*, 2:11-CV-926, 2013 WL 7877306, at *4 (W.D. La. Aug. 7, 2013), *report and recommendation adopted*, 2:11-CV-926, 2014 WL 949433 (W.D. La. Mar. 10, 2014) (applying rule in *Channer*); *Hutchinson v. Reese*, 5:07CV181-DCB-MTP, 2008 WL 4857449, at *4 (S.D. Miss. Nov. 7, 2008) (same).

The Fourth, Seventh, and Eighth Circuits have similarly recognized that requiring pretrial detainees to perform "general housekeeping responsibilities" is permissible.  *See Bijeol v. Nelson*, 579 F.2d 423, 424-25 (7th Cir. 1978) (denying pretrial detainee's claim that he was required to perform general housekeeping duties in his cell and community areas "without pay and, when refusing to do so, he was placed in segregation" because "general housekeeping responsibilities are not punitive in nature and for health and safety must be routinely observed in any multiple living unit"); *Hause v. Vaught*, 993 F.2d 1079, 1085 (4th Cir. 1993) (denying pretrial detainee's involuntary servitude claim that alleged no more than "general housekeeping responsibilities" of common areas); *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992) ("Requiring a pretrial detainee to perform general housekeeping chores, on the other hand, is not" punishment); *see also Mendez v. Haugen*, CV 14-4792 ADM/BRT, 2015 WL 5718967, at *5 (D. Minn. Sept. 29, 2015) (recognizing involuntary servitude does not prohibit pretrial detainee from performing general housekeeping chores such as "fixing and distributing meals, scrubbing dishes, laundering the sheets and clothing of other inmates, cleaning communal

bathrooms and shower stalls, removing trash from common areas, and sweeping, mopping, and vacuuming general-use hallways and rooms"). These cases recognize that, in a communal custody setting where thousands of detainees reside and are provided (free) basic necessities (shelter, food, healthcare, programming), detainees are expected to assist in cleaning and maintaining the facility in which they live, prepare the food that they eat, and wash the clothes that they wear.

There are three additional statutory clues that suggest Congress did not intend to criminalize labor by detainees in lawful custody.  First, § 1589(a) only imposes criminal liability on "[w]hoever" obtains forced labor, and § 1595(a) only provides a cause of action against "whoever" participated in a venture with the perpetrator.  Congress's definition of the word "whoever" does not include the federal government, *see* 1 U.S.C. § 1, and there is no indication in the TVPA or TVPRA that Congress intended otherwise in this context.  *See Mojsilovic v. Oklahoma ex rel. Bd. of Regents for the Univ. of Oklahoma*, 101 F. Supp. 3d 1137, 1142 (W.D. Okla. 2015), *aff'd*, 841 F.3d 1129 (10th Cir. 2016) (holding that there was no indication in the TVPA that Congress intended the word "whoever" to include States or public agencies).  To the contrary, excluding ICE from the reach of the statute is consistent with Congress's decision to delegate the detention of aliens to ICE.   Although the definition of "whoever" includes corporations "unless the context indicates otherwise," 1 U.S.C. § 1, the context indicates otherwise.  CoreCivic is acting at the direction, and for the benefit, of ICE and is "performing a federal function."  *Doe II*, 831 F.3d at 316-17.  Moreover, it would be inconsistent (and illogical) to conclude that the statute permits conduct done by the federal government, but criminalizes it when its contractors and local partners engage in the *same* conduct.

The second clue is 8 U.S.C. § 1555(d), which authorizes ICE to pay "allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed." Congress then set that rate: "not in excess of $1 per day." Department of Justice Appropriation Act, Pub. L. No. 95-86, 91 Stat. 426 (1978). Thus, Congress knew (and expected) that immigrant detainees in ICE custody performed labor for up to $1 per day *and even for no pay at all*. *See Alvarado Guevara v. I.N.S.*, 902 F.2d 394, 396 (5th Cir. 1990) ("The amount of payment was set by congressional act.").

The third clue is 28 C.F.R. § 545.23. That regulation provides:

> (a) Each sentenced inmate who is physically and mentally able is to be assigned to an institutional, industrial, or commissary work program. …
> (b) A pretrial inmate may not be required to work in any assignment or area other than housekeeping tasks in the inmate's own cell and in the community living area, unless the pretrial inmate has signed a waiver of his or her right not to work ….

Congress is presumed to have been aware of this regulation at the time it enacted the TVPA. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998). Construing § 1589 to criminalize housekeeping tasks by immigration detainees would also criminalize the same tasks by federal inmates and pretrial detainees. There is no relevant distinction between the two, but criminalizing the former would effectively abrogate the regulation. That cannot be what Congress intended. Nothing in the legislative history suggests it did.

**C.     Plaintiff Fails to State a Valid TVPA Claim Under §§ 1589(a)(1) and (3).**

Gonzalez's TVPA claim is purportedly based on violations of §§ 1589(a)(1) ("by means of force, threats of force, physical restraint, or threats of physical restraint"), –(a)(2) ("by means of serious harm or threats of serious harm"), –(a)(3) ("by means of the abuse or threatened abuse of law or legal process"), *and* –(a)(4) ("by means of any scheme, plan, or pattern intended to

cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint"). (Dkt. 1, ¶ 6.3.) Though Gonzalez alleges she was threatened with "punishment, including but not limited to lockdown and/or solitary confinement," (id., ¶ 4.31)—which is conceivably enough at this stage to allege a "threat of serious harm" under Subsections (a)(2) and (a)(4)[4]—she does not allege any facts to support her claim under Subsections (a)(1) or (a)(3). Gonzalez does not allege *facts* showing CoreCivic used force, threatened force, physically restrained her, or threatened physical restraint. Nor does she allege *facts* showing CoreCivic abused or threatened abuse of law or legal process. *See* 18 U.S.C. § 1589(c)(1) (defining term "abuse or threatened abuse of law or legal process" to mean "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action"). Her threadbare recitals of the elements of the statute is not enough to state a claim. *Iqbal*, 556 U.S. at 678. At a minimum, her TVPA claim should be dismissed to the extent it is based on §§ 1589(a)(1) and (a)(3).

### D.  Plaintiff Does Not Have a Cause of Action for Conduct Prior to December 23, 2008.

The provision in § 1595(a) authorizing a civil cause of action against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of" § 1589 did

---

[4] The term "serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

not go into effect until December 23, 2008.  Pub. L. No. 110-457, 122 Stat. 5044 (2008).

Congress did not give this 2008 Amendment retroactive effect.  *Griffin v. Alamo*, 4:14-CV-4065,

2016 WL 7391046, at \*3 (W.D. Ark. Dec. 21, 2016); *see also Adhikari v. Kellogg Brown &*

*Root, Inc.*, 845 F.3d 184, 202 (5th Cir. 2017) (holding that "extra-territorial jurisdiction"

provision in 18 U.S.C. § 1596, which was enacted at the same time and in the same amendment

as the "financial benefit" prong in § 1595(a), did not have retroactive effect).  Because

Gonzalez's Complaint alleges CoreCivic is liable under the "financial benefit" prong of § 1595

(Dkt. 1, ¶ 6.7), any liability can only attach to conduct after that effective date.  Alleged liability

based on conduct before the effective date must be dismissed.

## IV.   THE COURT SHOULD DISMISS PLAINTIFF'S DERIVATIVE CLAIMS.

Gonzalez's claims for negligence and unjust enrichment are purely derivative claims.

Their viability depend on the viability of her claim under the TVPA.  (See Dkt. 1, ¶¶ 7.1-8.9.)

Therefore, these derivative claims should be dismissed to the extent the predicate claims are

dismissed.

Gonzalez's unjust enrichment claim fails for an additional reason.  In Texas, unjust

enrichment is an element of restitution—not an independent cause of action.  *Gedalia v. Whole*

*Foods Mkt. Servs., Inc.*, 53 F. Supp. 3d 943, 961 (S.D. Tex. 2014) (citing *Walker v. Cotter*

*Properties, Inc.*, 181 S.W. 3d 895, 900 (Tex. App. Dallas 2006, no pet.)).  It is an equitable

theory of recovery which adds nothing to a plaintiff's substantive cause of action.  *In re Mud*

*King Prod., Inc.*, 514 B.R. 496, 521 (Bankr. S.D. Tex. 2014), *aff'd*, 2015 WL 862319 (S.D. Tex.

Feb. 27, 2015).  "Like other equitable claims and defenses, an adequate legal remedy may render

equitable claims of unjust enrichment … unavailable."  *BMG Direct Mktg., Inc. v. Peake*, 178

S.W. 3d 763, 770 (Tex. 2005).  Moreover, unjust enrichment "is not a proper remedy merely

because it might appear expedient or generally fair that some recompense be afforded for an

unfortunate loss ... or because the benefits to the person sought to be charged amount to a windfall." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W. 2d 39, 42 (Tex. 1992). Courts typically dismiss an unjust enrichment claim if an adequate remedy at law exists. *See Texas Carpenters Health Ben. Fund v. Philip Morris, Inc.*, 21 F. Supp. 2d 664, 678 (E.D. Tex. 1998), *aff'd*, 199 F.3d 788 (5th Cir. 2000) (dismissing unjust enrichment claim because plaintiffs had an adequate legal remedy in subrogation); *see also Bailey v. O'Donnell*, 980 F.2d 1445, *3 (5th Cir. 1992) ("It is well settled in Louisiana, and elsewhere, that if an adequate remedy at law exists, then equitable remedies, including unjust enrichment, are necessarily foreclosed."); *Encompass Office Sols., Inc. v. Connecticut Gen. Life Ins. Co.*, No. 3:11-CV-02487-L, 2017 WL 3268034, at *30 (N.D. Tex. July 31, 2017) ("Under Texas law, claims or requests for relief under equitable theories like unjust enrichment … are generally not available when an adequate legal remedy is available.").

Here, Gonzalez's claim for unjust enrichment should be dismissed because it merely seeks restitution based on the exact same allegations that serve as the basis for her other claims. On her TVPA claim, Gonzalez requests restitution and other damages. (Dkt. 1, ¶¶ 6.8-6.10.) *See* 18 U.S.C. §§ 1593 (mandatory restitution), and 1595 (civil remedy for violation of peonage, slavery, and human trafficking). On her negligence claim, she seeks compensatory and exemplary damages. (Dkt. 1, ¶ 7.21.) Adequate legal remedies undisputedly exist. The existence of these statutory and tort remedies preclude equitable relief for unjust enrichment. *See In re TXCO Res., Inc.*, 475 B.R. 781, 837-38 (Bankr. W.D. Tex. 2012) ("The existence of an adequate legal remedy [under the Texas Theft Liability Act] precludes TXCO's claim for unjust enrichment because the same conduct by Peregrine forms the basis of both claims."); *see also*

*Gedalia*, 53 F. Supp. 3d at 961 (dismissing unjust enrichment claim based on same violations of consumer protection statutes).

## V.   PLAINTIFF'S CLAIMS PERTAINING TO THE LA SALLE COUNTY REGIONAL DETENTION CENTER SHOULD BE DISMISSED.

Gonzalez's Complaint alleges she was detained at Laredo, Hutto, *and* the La Salle County Detention Center "at various times from May 2016 through August 2017." (Dkt. 1, ¶¶ 2.1, 3.4.)  She further alleges that La Salle is "owned by or under the control of Defendant." (Id., ¶ 3.4.)  But whereas she alleges forced labor and negligence at Laredo and Hutto, she does not make any factual allegations to support claims arising out of La Salle. (Dkt. 1, ¶¶ 4.55-4.69.) Indeed, she refutes her initial allegations regarding La Salle's ownership and her detention there with subsequent allegations.  For instance, she subsequently alleges that La Salle is "owned by La Salle County" and "maintained and operated by the County of La Salle" (id., ¶¶ 4.2, 4.11), and only "available and used by CoreCivic" (id., ¶¶ 4.2, 4.11).  This last allegation is supported only by her allegation that CoreCivic sent several Laredo detainees to La Salle after a reported chickenpox incident.  (Id., ¶ 4.72.)  It is unclear whether Gonzalez was included in that transfer, but even if she was, it does not support any of her claims.

Moreover, other allegations refute any suggestion that she was included in that transfer or ever spent time at La Salle.  She alleges that she was detained at Laredo "from May 10, 2016 through May 14, 2016"; at Hutto from May 14, 2016 "through June 27, 2016"; and at Laredo from June 27, 2016 through August 1, 2017, when she was released." (Dkt. 1, ¶ 4.47-4.48)  She never alleges when she was detained at La Salle and these allegations refute that she ever was there.  Because Gonzalez admits that CoreCivic does not own or operate La Salle and fails to allege when she was there or any allegations supporting claims at that facility, the Court should dismiss her claims to the extent they rely on it.

## VI.    CONCLUSION

For these reasons, the Court should dismiss Plaintiff's Complaint with prejudice.

Dated:  June 8, 2018                              Respectfully submitted,

/s/ Daniel P. Struck
Daniel P. Struck *(pro hac vice)*
Rachel Love *(pro hac vice)*
Ashlee B. Hesman *(pro hac vice)*
Jacob B. Lee *(pro hac vice)*
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Phone: (480) 420-1600
Fax: (480) 420-1695

Allison Bowers, Bar No. 24006170
HUTCHESON BOWERS LLLP
Four Barton Skyway
1301 South Mopac, Suite 430
Austin, Texas 78746
Phone: (512) 777-4447
Fax: (512) 777-4497

Attorneys for Defendant CoreCivic, Inc.

3459272.1

## CERTIFICATE OF SERVICE

        I hereby certify that on the 8th day of June, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Thomas H. Padgett, Jr. | tpadgett@buenkerlaw.com |
| Josef F. Buenker | jbuenker@buenkerlaw.com |
| Allison Bowers: | allison@hutchesonbowers.com |
| Daniel P. Struck | dstruck@strucklove.com |
| Rachel Love | rlove@strucklove.com |
| Ashlee B. Hesman | ahesman@strucklove.com |

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

        N/A


                           /s/ Daniel P. Struck
                           Daniel P. Struck