# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
January 20, 2021
Lyle W. Cayce
Clerk

No. 19-50691

_____

MARTHA GONZALEZ, INDIVIDUALLY AND *on behalf of* ALL OTHERS
SIMILARLY SITUATED,

*Plaintiff—Appellee,*

*versus*

CORECIVIC, INCORPORATED,

*Defendant—Appellant.*

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:18-CV-169

_____

Before SMITH, HO, and OLDHAM, *Circuit Judges.*

J U D G M E N T

This cause was considered on the record on appeal and the briefs on
file.

IT IS ORDERED and ADJUDGED that the judgment of the
District Court is AFFIRMED.

IT IS FURTHER ORDERED that each party bears its own costs
on appeal.

A True Copy
Certified order issued Feb 18, 2021

*Lyle W. Cayce*
Clerk, U.S. Court of Appeals, Fifth Circuit

No. 19-50691

JAMES C. HO, *Circuit Judge*, concurring.

ANDREW S. OLDHAM, *Circuit Judge*, dissenting.

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 20, 2021

Lyle W. Cayce
Clerk

No. 19-50691

---

MARTHA GONZALEZ, INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED,

*Plaintiff—Appellee,*

*versus*

CORECIVIC, INCORPORATED,

*Defendant—Appellant.*

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:18-CV-00169

---

Before SMITH, HO, and OLDHAM, *Circuit Judges*.

JAMES C. HO, *Circuit Judge*:

Judges are not legislators. Legislators write laws—judges faithfully interpret them. So if a party wishes to have its activities exempted from a statute, it must ask the Legislature to enact such an exemption, not the judiciary.

The Trafficking Victims Protection Act of 2000 (TVPA) imposes civil liability on "[w]hoever knowingly provides or obtains the labor or services of a person" by certain coercive means. 18 U.S.C. § 1589(a). *See also id.* § 1595

No. 19-50691

(civil remedy). CoreCivic claims its work programs categorically fall outside the reach of this forced-labor prohibition. But the text of the Act contains no such detainee-labor exemption. CoreCivic simply theorizes that Congress would not have wanted the law to reach work programs like the ones it runs.

We agree with the district court as well as the Eleventh Circuit in rejecting this theory and therefore affirm. *See Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1276–78 (11th Cir. 2020).

## I.

CoreCivic is a private company that operates detention facilities holding alien detainees on behalf of Immigration and Customs Enforcement (ICE). As part of its contract with ICE, CoreCivic provides a work program for the detainees. *See* U.S. Immigration & Customs Enf't, Performance-Based National Detention Standards 2011 § 5.8(I), (V) (PBNDS). The PBNDS requires these work programs to be voluntary. *Id.* at § 5.8(II)(2).

But according to Martha Gonzalez, a former detainee, CoreCivic's work programs are not voluntary. In truth, she says, CoreCivic forced her to clean the detention facilities, cook meals for company events, engage in clerical work, provide barber services for fellow detainees, maintain landscaping, and other labors. And if she refused, the company would impose more severe living conditions, including solitary confinement, physical restraints, and deprivation of basic human needs such as personal hygiene products.

CoreCivic moved to dismiss on the ground that the TVPA does not regulate "labor performed by immigration detainees in lawful custody." Or to rephrase it more bluntly, that its activities are categorically exempt from the TVPA. The district court denied the motion, concluding that the plain terms of § 1589(a) cover labor conducted by immigration detainees in a

private detention center. *See Gonzalez v. CoreCivic, Inc.*, 2019 WL 2572540, at *2 (W.D. Tex. Mar. 1, 2019).

The district court then granted CoreCivic's motion to certify the following question for interlocutory appeal: "Whether the TVPA applies to work programs in federal immigration detention facilities." We agreed to accept the appeal under 28 U.S.C. § 1292(b).

## II.

"In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019).

Together, §§ 1589(a) and 1595 impose civil liability on "[w]hoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of" four coercive methods. 18 U.S.C. § 1589(a). *See also id.* § 1595 (civil remedy). CoreCivic contends that this language does not capture labor performed in work programs in a federal immigration detention setting.

But nothing in the text supports this claim. CoreCivic is clearly an entity covered by the term "whoever." *See* 1 U.S.C. § 1 (defining "whoever" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"). It has clearly "obtain[ed]" the labor of these alien detainees. *See Obtain*, AMERICAN HERITAGE DICTIONARY (5th ed. 2011) (defining "obtain" as "[t]o succeed in gaining possession of as the result of planning or endeavor; acquire"). And CoreCivic does not even try to dispute that the term "person" naturally encompasses alien detainees.

Instead, CoreCivic theorizes that, if we apply § 1589 to its work programs, then as night follows day, we must also apply it to parents who

compel their children to do ordinary household chores. The argument does not bear scrutiny. By that logic, a thief who steals a toy from a child could avoid a larceny conviction by claiming that no one would convict a parent for taking his child's toy away for misbehavior. That argument would surely fail. And that is presumably because we do not construe criminal statutes like larceny or battery to reflexively apply to the parent-child relationship, but rather read them in light of parents' well-established rights over their own children. Indeed, the Supreme Court has applied this principle to the Constitution, observing that "the Thirteenth Amendment was not intended to apply to 'exceptional' cases well established in the common law at the time of the Thirteenth Amendment, such as 'the right of parents and guardians to the custody of their minor children or wards.'" *United States v. Kozminski*, 487 U.S. 931, 944 (1988) (quoting *Robertson v. Baldwin*, 165 U.S. 275, 282 (1897)). And the same logic applies here: Not every parent in America is a slaveowner, and not every parent in America is a human trafficker. As CoreCivic acknowledges, the Sixth Circuit had little trouble concluding that "forcing children to do household chores cannot be forced labor without reading [§ 1589] as making most responsible American parents and guardians into federal criminals . . . . An American parent has always had the right to make his child perform household chores." *United States v. Toviave*, 761 F.3d 623, 625 (6th Cir. 2014).

Alternatively, CoreCivic claims that § 1589 must be construed narrowly to cover only forced labor that arises in the international human trafficking context. To support that claim, it cites various Congressional findings that express concerns specific to international human trafficking. But the text of § 1589 itself is broad, and not limited to forced labor in the international human trafficking context.

CoreCivic also invokes *Bond v. United States*, 572 U.S. 844 (2014), for the proposition that "[p]art of a fair reading of statutory text is recognizing

that 'Congress legislates against the backdrop' of certain unexpressed presumptions." *Id.* at 857 (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)). According to CoreCivic, one such "unexpressed presumption" is that detainees would continue to be subject to work requirements in the detention context.

But that overreads *Bond*. *Bond* concerns federalism and "the well-established principle that it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers." *Id.* at 858 (cleaned up). *See also Loughrin v. United States*, 573 U.S. 351, 362 (2014) (same). *Bond* does not give courts a free-floating power to create statutory exemptions anytime a judge thinks Congress would have exempted a certain activity had anyone asked.

Because it lacks any serious textual argument, CoreCivic is forced to resort to extratextual considerations. It quotes extensively from the legislative history of the TVPA to bolster its argument that § 1589(a) applies only to international human trafficking—and thus not to work programs in federal immigration detention facilities. But legislative history cannot " 'muddy' the meaning of 'clear statutory language.' " *Food Mktg. Inst.*, 139 S. Ct. at 2364 (quoting *Milner v. Dep't of the Navy*, 562 U.S. 562, 572 (2011)).

Finally, CoreCivic invokes the rule of lenity. But that canon of interpretation has force only where a law is "grievously ambiguous, meaning that the court can make no more than a guess as to what the statute means." *Shular v. United States*, 140 S. Ct. 779, 789 (2020) (Kavanaugh, J., concurring). And § 1589(a) does not contain a categorical exemption—not even an ambiguous one—for work programs in detention facilities.

No. 19-50691

* * *

Because on its face § 1589 unambiguously protects labor performed in work programs in federal immigration detention facilities, the "judicial inquiry is complete." *Rubin v. United States*, 449 U.S. 424, 430 (1981). We affirm.[1]

---

[1] Amicus curiae contends that it would be absurd to interpret the TVPA to impose liability for labor obtained pursuant to PBNDS-compliant, federally-contracted work programs. Amicus also argues that CoreCivic may have immunity as a government contractor. *See, e.g.*, *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016); *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 204 (5th Cir. 2009). We express no view on these arguments. It may be that CoreCivic is immune from liability, or that it did not actually "obtain[]" Plaintiffs' labor in a manner prohibited by the TVPA. But these questions are beyond the scope of the narrow question we accepted for interlocutory appeal—whether the TVPA "applies" to work programs in federal immigration detention facilities—and should therefore be addressed in the first instance by the district court.

No. 19-50691

James C. Ho, *Circuit Judge*, concurring:

According to the dissent, we should resolve this appeal by deciding an issue not presented by the parties, either here or before the district court. But just last year, the Supreme Court rebuked the Ninth Circuit for doing just that—deciding an issue not presented by the parties, either on appeal or before the district court, without any compelling justification for doing so. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020).

"In our adversarial system of adjudication, we follow the principle of party presentation." *Id.* at 1579. "[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Id.* (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). "Our system 'is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.'" *Id.* (cleaned up) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment)). "In short: Courts are essentially passive instruments of government." *Id.* (cleaned up). "They do not . . . sally forth each day looking for wrongs to right. They wait for cases to come to them, and when cases arise, courts normally decide only questions presented by the parties." *Id.* (cleaned up).

The dissent nevertheless insists that we should have reached the alleged pleading deficiency it has identified in this case. It accuses the majority of abdicating our judicial duty by answering only the question requested by the defendant and certified by the district court for interlocutory appeal. As the dissent puts it, "[w]e have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Post*, at 13 (quoting *Cohens v. Virginia*, 19 U.S. 264, 404 (1821)).

But an appellate court is not *required* to go beyond the questions certified in an interlocutory appeal—and the dissent does not cite a single authority that says otherwise. To the contrary, the dissent's authorities confirm that this is a matter of judicial discretion, not duty.

For example, the dissent relies on our en banc decision in *Castellanos-Contreras v. Decatur Hotels, LLC*, 622 F.3d 393 (5th Cir. 2010). But there we confirmed that this is a matter of discretion, not duty: "The conclusion that we have the *power* to consider these [unspecified] questions does not end our jurisdictional analysis. Interlocutory review under § 1292(b) is not mandatory; rather, it is *discretionary*. Thus, we must consider whether we *should* address these questions at this stage." *Id.* at 399 (emphases added). And that conclusion is entirely compatible with Supreme Court precedent. Nothing in *United States v. Stanley*, 483 U.S. 669 (1987), suggests that courts are ever duty-bound to decide an uncertified issue. And *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199 (1996), makes clear that an "appellate court *may* address any issue fairly included within the certified order." *Id.* at 205 (emphasis added).

What's more, the dissent is unable to cite a single case where our court did what it urges us to do here—that is, exercise our discretionary interlocutory jurisdiction to reach an issue not presented by the parties either before the district court or on appeal. None of the cases cited by the dissent support this kind of judicial adventurism—and certainly not in the face of the Supreme Court's unanimous admonition in *Sineng-Smith*.[1]

---

[1] For example, in *Castellanos-Contreras*, we went out of our way to explain that we were deciding an uncertified issue only because the parties had repeatedly pressed it: "[T]he parties have briefed the merits three times: to the original panel, in connection with the rehearing petitions, and in merits briefing to the en banc court.

No. 19-50691

So the idea that the dissent finds so abhorrent—"that we can choose, in our discretion, to limit ourselves to the question certified by the district court"—isn't just some half-baked "theory." *Post*, at 13. It's the law.

* * *

To be sure, the party presentation principle is "supple, not ironclad." *Sineneng-Smith*, 140 S. Ct. at 1579. "There are no doubt circumstances in which a modest initiating role for a court is appropriate." *Id. See also id.* at 1582–83 (listing some such circumstances).

"But this case scarcely fits that bill." *Id.* at 1579. The defendant here, like the defendant in *Sineneng-Smith*, didn't just fail to present the issue in question. It "presented a contrary theory of the case in the District Court." *Id.* at 1581.

In the district court, CoreCivic admitted in its motion to dismiss that Gonzalez's complaint "alleges she was threatened with 'punishment, including but not limited to lockdown and/or solitary confinement'"—and conceded that that is "conceivably enough at this stage to allege a 'threat of serious harm' under [18 U.S.C. §§ 1589] (a)(2) and (a)(4)." So the dissent's theory—that Gonzalez's complaint fails because compliance with the PBNDS constitutes compliance with the TVPA, and so Plaintiff must separately allege a violation of the PBNDS in order to adequately plead a

---

Additionally, this case has been the subject of two oral arguments. After so much time and effort has been expended by both the parties and the court as a whole, the discretionary decision *now* becomes much different, and the majority of the court agrees it should be resolved in favor of hearing the merits." 622 F.3d at 399–400. So too in *Cazorla v. Koch Foods of Mississippi, L.L.C.*, 838 F.3d 540 (5th Cir. 2016), *Luera v. M/V Alberta*, 635 F.3d 181 (5th Cir. 2011), and *Brabham v. A.G. Edwards & Sons Inc.*, 376 F.3d 377 (5th Cir. 2004). The parties argued the unspecified issue before the district court and on appeal in *Cazorla*, 838 F.3d at 546–49, and *Brabham*, 376 F.3d at 379–80 & n.2, and on appeal in *Luera*, 635 F.3d at 186–87.

violation of the TVPA—is not just an argument that Defendant never made, either before the district court or on appeal. It's one that directly conflicts with Defendant's actual positions before the district court.

If anything, then, this is an especially weak case for disregarding the party presentation principle. Of course, if Defendant wishes to abandon its earlier position and pursue the pleading defect urged by the dissent, it may attempt to do so on remand—and the district court can determine in the first instance whether the issue is forfeited (or even waived) or remains open to litigation. As we have said on countless occasions, we are a court of review, not first view.

But this brings up yet another problem with deciding the unspecified issue on interlocutory appeal. Gonzalez has already asked the district court for leave to amend her complaint in the event it is found deficient. Even accepting, then, the dissent's theory of pleading defect (and even setting aside the party presentation principle), I see no reason why we would deprive Gonzalez of the opportunity to amend her complaint, and the dissent offers none. So whatever we do, we aren't ending this litigation today—not under the majority's theory or the dissent's.

* * *

The approach proposed by the dissent is a marked departure from our established norms—both the principle of party presentation and the judicial discretion not to reach uncertified issues (particularly when no party has asked us to do so). The dissent disagrees with the majority's adherence to these norms. But it should not be surprised by it. It's what the Eleventh Circuit did in *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269 (11th Cir. 2020)—a case involving the same defendant and the same specified issue on interlocutory appeal. And it's what the Supreme Court instructed in

No. 19-50691

*Sineneng-Smith*—consistent with the proper, restrained role of the judiciary in our adversarial system of adjudication.  I concur.

No. 19-50691

Andrew S. Oldham, *Circuit Judge*, dissenting:

The majority and I agree that our jurisdiction under 28 U.S.C. § 1292(b) extends to the entire "order" we certified for interlocutory review. We disagree about whether to exercise that jurisdiction. I would exercise it and reverse.

I.

I begin, as always, with jurisdiction and the statutory text. We have jurisdiction under 28 U.S.C. § 1292(b). The text provides:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that *such order* involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal *from the order* may materially advance the termination of the litigation, he shall so state in writing in such order. The Court of Appeals . . . may thereupon, in its discretion, permit an appeal to be taken *from such order*, if application is made to it within ten days after the entry of the order.

28 U.S.C. § 1292(b) (emphases added). The statutory text indicates that "appellate jurisdiction applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court." *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 205 (1996); *see also United States v. Stanley*, 483 U.S. 669, 677 (1987) (explaining that § 1292(b) "brings the 'order,' not the question, before the court"). Our en banc precedent is in accord. *See Castellanos-Contreras v. Decatur Hotels, LLC*, 622 F.3d 393, 398–400 (5th Cir. 2010) (en banc). As is the leading federal courts treatise. *See* 16 Charles Alan Wright, Arthur R. Miller & Edward H.

Cooper, Federal Practice and Procedure § 3929, at 454 (3d ed. 2012) [hereinafter "Wright & Miller"] ("[T]he scope of the issues open to the court of appeals is closely limited to the order appealed from, but not to the specific stated question."). Thus, our panel unanimously agrees that we can review the district court's "entire order, either to consider a question different than the one certified as controlling or to decide the case despite the lack of any identified controlling question." *Yamaha*, 516 U.S. at 205 (quotation omitted).

Here, the district court denied CoreCivic's motion to dismiss under Rule 12(b)(6). That's the order the district court certified under 28 U.S.C. § 1292(b), and it's the order we accepted for interlocutory appeal under that same provision. In the certified-and-accepted order, the district court identified what it thought was a controlling legal question—namely, whether CoreCivic is exempted from the Trafficking Victims Protection Act. But the text of § 1292(b), *Yamaha*, *Stanley*, *Castellanos-Contreras*, and Wright & Miller all say that we are not limited to the question identified by the district court. Again, our jurisdiction extends to "the order"—that is, the order denying CoreCivic's motion to dismiss.

The majority nonetheless says we have discretion not to exercise that jurisdiction. *But cf. Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given."). The majority's theory appears to be that we can choose, in our discretion, to limit ourselves to the question certified by the district court.

There are courts that have such discretion, but ours is not one of them. For example, state courts have discretion to answer certified questions. *See, e.g.*, Tex. R. App. P. 58.1. One reason why is because they're not bound by Article III's case-or-controversy requirement—which means they're also

not bound by Article III's prohibition on advisory opinions. *See* Letter from Chief Justice John Jay and the Associate Justices to President George Washington (Aug. 8, 1793), *in* 3 CORRESPONDENCE & PUBLIC PAPERS OF JOHN JAY 488–89 (Johnson ed., 1891). If President Washington had asked the Pennsylvania Supreme Court what to do about the *Little Sarah* and Citizen Genêt, he might've gotten an advisory opinion. But he chose to ask the U.S. Supreme Court, so all he got was a reminder that federal courts do only one thing: decide cases and controversies. *See ibid.*

We decide them not by answering abstract legal questions but by rendering *judgments*. As Justice Scalia once explained for the Court:

> [T]he Framers crafted [Article III's] charter of the judicial department with an expressed understanding that it gives the Federal Judiciary the power, not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the Article III hierarchy—with an understanding, in short, that a judgment conclusively resolves the case because a "judicial Power" is one to render dispositive judgments.

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218–19 (1995) (quotation omitted). And when it comes to rendering judgments, we do not have discretion. We have to get the judgment right. Every time.

Perhaps we could limit ourselves to the district court's certified question when it's sufficient to reach the correct judgment. For example, if the district court made two mistakes, we could exercise discretion to correct only the one certified by the district court. *See Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 689–90 (9th Cir. 2011). But I do not understand how we could

affirm on the certified question where we're convinced that a second, uncertified one would require reversal. [*]

That's particularly true when we're exercising jurisdiction under § 1292(b). After all, § 1292(b) authorizes that jurisdiction where "an immediate appeal from the order may materially advance the ultimate termination of the litigation." And it does nothing to advance the litigation—in fact, it does the opposite—when we send a case to discovery in the face of a deficient complaint. *See Cazorla v. Koch Foods of Miss., L.L.C.*, 838 F.3d 540, 548 (5th Cir. 2016) (reviewing an uncertified question where "fully addressing" the order could "hasten the end of th[e] already long-running litigation"); *Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377, 380 n.2 (5th Cir. 2004) (reviewing an uncertified question where doing so would "expeditiously resolve" the litigation). In the interest of advancing the litigation as required by § 1292(b), our court has even extended review to questions that were neither briefed by the parties nor certified by the district court. *See, e.g.*, *Luera v. M/V Alberta*, 635 F.3d 181, 186 (5th Cir. 2011)

---

[*] There are plenty of other examples where federal courts have discretion to exercise jurisdiction—for example, courts can certify questions to state courts or abstain under *Pullman*, *Younger*, *Colorado River*, &c. But of course, none of those entails entering an erroneous judgment. And even the most ardent proponents of jurisdictional discretion insist that it's guided by some principle exogenous to the case or controversy. *Compare* David L. Shapiro, *Jurisdiction and Discretion*, 60 N.Y.U. L. Rev. 543, 577–79 (1985) (defending "principled discretion" in exercising jurisdiction, guided by "criteria drawn from the relevant statutory or constitutional grant of jurisdiction or from the tradition within which the grant arose"), *with* Martin Redish, The Federal Courts in the Political Order: Judicial Jurisdiction and American Political Theory 47–74 (1991) (arguing failure to exercise jurisdiction cannot be reconciled with Congress's lawmaking role), *and* Alexander Bickel, The Least Dangerous Branch: The Supreme Court at the Bar of Politics 173 (1962) (arguing that, whatever jurisdictional discretion the Supreme Court might have, inferior federal courts must "resolve all controversies within their jurisdiction, because the alternative is chaos").

(addressing an unbriefed, uncertified question because resolving it could moot other questions).

## II.

We unquestionably have jurisdiction over the district court's entire order denying CoreCivic's motion to dismiss under Rule 12(b)(6). Reviewing that order, I am convinced that plaintiff failed to state a claim. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). I would reverse and instruct the district court to dismiss the complaint.

### A.

Gonzalez alleges that CoreCivic is operating (and the United States is paying for) a slave-labor camp. That claim implicates two statutes: one that authorizes detainee work programs and another that prohibits human trafficking.

Let's start with the statutory authorization. Congress has long authorized paid voluntary work programs for noncitizens in detention. *See* 8 U.S.C. § 1555. Section 1555 authorizes the "payment of allowances to aliens, while held in custody under the immigration laws, for work performed." *Ibid.*; *see also* Dep't of Just. Appropriation Act, Pub. L. No. 95-86, 91 Stat. 426 (1978) (setting pay rate for detainee work pursuant to voluntary work program at $1 per day). Such work programs are governed by Immigration and Customs Enforcement's Performance-Based National Detention Standards. *See* Immigr. and Customs Enf't, Performance Based National Detention Standards § 5.8, at 405–09 (2011) [hereinafter "PBNDS"]. The PBNDS allows detainees to "volunteer for work assignments" and guarantees monetary compensation of "at least $1.00 (USD) per day" for any work completed. *Id.* at 405, 407. PBNDS programs are purely voluntary: "Detainees shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping." *Id.* at

405. CoreCivic operates PBNDS programs in Texas for the benefit of the United States and ICE.

On the extreme other end of the voluntariness spectrum is the Trafficking Victim Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464 ("TVPA"). Congress enacted the TVPA to prohibit slavery. *See* 22 U.S.C. § 7101(a). The TVPA imposes criminal penalties on "[w]hoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of" threats, force, restraint, or threat of harm or abuse. 18 U.S.C. § 1589(a), (d). Section 1595 permits "an individual who is a victim of a violation" to bring a civil action against the perpetrator to recover damages. *Id.* § 1595. Gonzalez alleges that CoreCivic's PBNDS programs are not voluntary at all; in reality, she says, they're slave-labor camps that entitle her to money damages under the TVPA.

Thus to state a claim, Gonzalez first must allege that CoreCivic violated the PBNDS. In the absence of such an allegation, PBNDS programs like CoreCivic's are by definition voluntary. *See* PBNDS § 5.8 at 405. Then, assuming Gonzalez pleaded that CoreCivic's work programs are involuntary, she must also allege that they violate the TVPA's anti-slavery provisions.

## B.

### 1.

Let's start with Gonzalez's purely conclusory allegations. These must be ignored altogether. *See Iqbal*, 556 U.S. at 680–81.

For example, Gonzalez claims that "CoreCivic owns forced labor camps" that treat detainees as a "slave labor force" to "amass profits and revenues." She further claims that "CoreCivic's acts were carried out with intent, malice, oppression, fraud and duress" with the only goal being profit maximization. The complaint alleges that CoreCivic's business model is a

"go directly to jail and work for free" system, under which the company uses "egregious, unconstitutional, illegal and unfair labor practices" to "maximize its profits." The complaint further explains that the company "made it very clear, through words and deeds, that unless the detainees worked, CoreCivic would increase their misery." Gonzalez claims that these "draconian and harsh" conditions and the forced labor led to billions of dollars in revenue for CoreCivic, while causing "severe mental distress and anguish" to enslaved detainees.

These conclusory allegations are insufficient to state a claim under *Twombly* and *Iqbal*. They boil down to little more than "formulaic recitation of the elements" of a claim under the TVPA—namely, that CoreCivic maliciously runs slave-labor camps focused on extracting free labor to bolster corporate bottom lines. *Twombly*, 550 U.S. at 555. The allegations fail not because of their fanciful nature, but instead because they contravene *Twombly* and *Iqbal* by nakedly asserting conclusions. *See Iqbal*, 556 U.S. at 681; *Twombly*, 550 U.S. at 551.

2.

Not all of Gonzalez's claims are so conclusory, however. For example, Gonzalez alleges that "detainees were forced to work, and if they refused, they were subjected to various punishments, including but not limited to solitary confinement and deprivation of facilities." Specifically, Gonzalez claims that CoreCivic forced detainees to "clean the 'pods' where they were housed, and . . . clean, maintain, and operate other areas of the CoreCivic detention facilities under threat of punishment." Gonzalez claims that she worked "virtually every day . . . in the kitchen, [and] sorting clothing" among other duties. According to Gonzalez, "CoreCivic continually" told "detainees that the work was voluntary" but subversively threatened them with punishment if they refused. This threatened punishment included

subjecting detainees to solitary confinement, denying them "toothbrushes and toothpaste," and forcing them to "wait hours" for "sanitary or other feminine products."

Gonzalez plainly alleges that she was forced to work—but she does not allege that any of these requirements violated the PBNDS. For example, Gonzalez complains that she was required to clean her "pod" at threat of penalty. That isn't helpful for showing CoreCivic's liability under the TVPA because the PBNDS requires detainees to clean their private cells, and the PBNDS falls outside of the reach of the TVPA. *See* PBNDS § 5.8V(C), at 406. Under the PBNDS, detainees' refusal to clean their private areas can subject them to loss of commissary privileges to purchase personal hygiene items, and even to solitary confinement of up to 72 hours. *See id.* § 3.1 app. 3.1.A, at 225–26. Gonzalez further claims that she worked in a variety of contexts and was paid between $1.00 and $2.00 per day. But the PBNDS plainly authorizes all of this under specified circumstances—and Gonzalez does not allege that CoreCivic ever exceeded the PBNDS's disciplinary measures.

Gonzalez also focuses on the alleged threats to detainees who refused to work. But the complaint doesn't identify any particular instances of CoreCivic threatening detainees. *See Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc) (declining to adopt naked assertions "devoid of . . . factual enhancement" (quotation omitted)). Nor does it differentiate between alleged punishment for failing to perform work that a detainee has voluntarily assumed (as permitted by the PBNDS) and punishment for refusal to participate in the voluntary work program to begin with. Further, Gonzalez alleges that CoreCivic threatened her with the loss of certain personal items. But she does not allege that CoreCivic did so in violation of the PBNDS. And the PBNDS specifically authorizes CoreCivic to take away commissary privileges (and hence access to personal items) when detainees

commit disciplinary infractions. *See* PBNDS § 3.1 app. 3.1.A, at 226. Thus, Gonzalez's threat allegations are at very most *consistent* with liability under the TVPA—and that's insufficient to survive Rule 12(b)(6). *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557.

### III.

Finally, a word about *United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020). In that case, the Ninth Circuit appointed *amici*, invited them to brief and argue novel issues framed by the panel, and introduced legal questions never raised by either party at any point in the case. *Id.* at 1578. Then, based solely on questions injected into the case by the Ninth Circuit, the panel held a federal statute unconstitutional. *See id.* at 1581. The Supreme Court reversed because the Ninth Circuit affected a "radical transformation" of the case and violated the party-presentation principle. *Id.* at 1582.

My position is the opposite of *Sineneng-Smith*. That's for at least two reasons.

First, I would follow the Supreme Court's specific instructions in *Yamaha* and *Stanley* (as well as our en banc court's instructions in *Castellanos-Contreras*). It would be quite something if following the Supreme Court's instructions regarding § 1292(b) jurisdiction somehow violated the party-presentation principle. And far from urging anyone to hold unconstitutional a statute enacted by Congress, I would decide this case by respecting the statutes Congress enacted to regulate our jurisdiction and to bless voluntary work programs.

Second, the parties have vigorously litigated the deficiencies in Gonzalez's complaint. In its answer, CoreCivic argued that Gonzalez failed to state a claim. And in its motion to dismiss, CoreCivic alleged two infirmities in Gonzalez's complaint. First, CoreCivic reasserted the absence of factual pleadings sufficient to withstand 12(b)(6) scrutiny. And second, the

motion to dismiss explained that Gonzalez failed to plead facts sufficient to make the necessary predicate finding that CoreCivic violated the voluntary work program expressly authorized by Congress in the Department of Justice Appropriation Act of 1978. It's the denial of that Rule 12(b)(6) motion that's before us today.

\*       \*       \*

Gonzalez alleges that a major government contractor conspired with the United States to enslave immigrant detainees. Stripped of its rhetoric, the complaint offers allegations that she was required to work at the direction of CoreCivic agents. But Gonzalez offers no allegations whatsoever that CoreCivic required her to do anything that the PBNDS did not require. That makes her complaint plainly insufficient. I would reverse.

# United States Court of Appeals
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

February 18, 2021

Ms. Jeannette Clack
Western District of Texas, Austin
United States District Court
501 W. 5th Street
Austin, TX 78701-0000

        No. 19-50691    Gonzalez v. CoreCivic
                        USDC No. 1:18-CV-169

Dear Ms. Clack,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                    Sincerely,

                    LYLE W. CAYCE, Clerk

                    By: _____
                    Roeshawn Johnson, Deputy Clerk
                    504-310-7998

cc:  Mr. Nicholas D. Acedo
     Mr. Josef Franz Buenker
     Mr. Thomas Henry Padgett Jr.
     Mr. Iain Gordon Simpson